IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:16-CV-765-D

WANZA COLE,            )
                       )
            Plaintiff, )
                       )
      v.               )     **ORDER**
                       )
WAKE COUNTY BOARD OF   )
EDUCATION,             )
                       )
            Defendant. )

Wanza Cole ("Cole" or "plaintiff"), an African-American female, alleges that the Wake County Board of Education (the "Board" or "defendant") racially discriminated and retaliated against her in violation Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 et seq. See Am. Compl. [D.E. 46] ¶¶ 86–131; [D.E. 57]. On October 7, 2019, the Board moved for summary judgment [D.E. 66] and filed a statement of material facts, documents, and a memorandum in support [D.E. 67, 68, 69]. On December 12, 2019, Cole responded in opposition [D.E. 79] and filed a statement of material facts and documents [D.E. 80, 81]. On December 13 and 19, 2019, Cole filed additional documents [D.E. 82, 84]. On January 10, 2020, the Board replied [D.E. 85]. As explained below, the court grants the Board's motion for summary judgment.

I.

Cole began working as principal at West Cary Middle School ("WCMS") in 2007. See Am. Compl. [D.E. 46] ¶ 11. At all times relevant in this case, Tim Locklair ("Locklair"), the Wake County Public School System ("WCPSS") Area Superintendent, was Cole's supervisor. See Locklair Aff. [D.E. 68-4] ¶ 3; Am. Compl. ¶ 16. Dr. Bryan Martin ("Martin") was the WCPSS

Senior Director of Employee Relations. See Martin Dep. [D.E. 68-14] 1; Am. Compl. ¶ 15. Martin supervised Mary Swann ("Swann"), a Senior Administrator for Employee relations who investigated employee conduct issues at Martin's request. See Swann Aff. [D.E. 68-2] ¶ 4. Douglas Thilman was the WCPSS Assistant Superintendent for Human Resources. See Martin Dep. [D.E. 68-14] 1. Dr. James Merrill ("Merrill") was the WCPSS Superintendent. See Merrill Dep. [D.E. 68-22] 1. Cathy Moore ("Moore") was the WCPSS Assistant Superintendent. See Moore Dep. [D.E. 68-13] 1. Sally Reynolds ("Reynolds") facilitated WCPSS's North Carolina Educator Effectiveness System ("NCEES"), an online tool for teacher evaluations and other school-related resources. See Reynolds Dep. [D.E. 68-24] 1–2.

On November 20, 2014, Melissa Jones, a teacher at WCMS, emailed Thilman a letter from Jones and another WCMS teacher, Heather McGarry, stating that Cole "belittled, harassed, and individually called out [teachers] in front of their peers." Martin Dep. Ex. 1 [D.E. 84-7] 2. Additionally, Jones and McGarry stated that during the 2013–14 school year, "there were multiple staff members who were not observed" and yet "were asked to sign an end of the year observation form," a "pattern" that Jones and McGarry state "continued for the 2014–15 school year." Id.

The North Carolina State Board of Education Policy establishes the public school teacher evaluation process. See Locklair Aff. Exs. 1, 2 [D.E. 68-5, 68-6]. Generally, the policy required school administrators to perform annual evaluation of teachers. See [D.E. 68-5] 1, 4; [D.E. 68-6] 1, 5. The annual evaluation policy included an observation component stating that "[d]uring observations, the principal . . . shall note the teacher's performance in relationship" to the applicable state-mandated standards. See [D.E. 68-5] 2; [D.E. 68-6] 3. Additionally, the policy provides that "the principal shall . . . secure the teacher's signature" on the appropriate evaluation forms. See [D.E. 68-5] 3; [D.E. 68-6] 4. The Board adopted a policy implementing the state-mandated

evaluation process. See [D.E. 68-7]. WCPSS Human Resources created an evaluation calendar which described the steps involved in a typical evaluation process, directs teachers to the NCEES evaluation website, and establishes an evaluation time line. See [D.E. 68-8, 68-9]. The evaluation calender notes that it "is strictly for guidance and creates no additional rights for the employee." [D.E. 68-8] 3; [D.E. 68-9] 4. Cole had copies of the evaluation calenders. See [D.E. 68-26] 16–17.

Thilman sent Jones's and McGarry's letter to Martin. See Martin Dep. Ex. 1 [D.E. 84-7]. Thilman asked Martin to investigate the allegations concerning teacher evaluations. See Martin. Dep. [D.E. 68-14] 2–3. Martin conducted a "spot-check" of the NCEES system, and on December 16, 2014, Martin met with Cole at WCMS regarding the allegations. Id. at 4–5. Martin told Cole that he was concerned about WCMS's evaluation process, that he would conduct a "random sample" of teachers, and that Swann would interview teachers. Id. at 5–6. During the 2013–14 school year, Thilman sent numerous emails describing NCEES technical issues and detailing procedures that teachers and administrators should follow to address those issues. See Reynolds Dep. Ex. 3 [D.E. 84-18] 1–26. Reynolds testified that she was "not aware of any school having an issue with widespread missing data" in NCEES for 2013–14. See Reynolds Aff. [D.E. 68-3] ¶ 6. Cole claims that she had, in fact, conducted teacher evaluations, and that the NCEES system did not reflect her completed evaluations. See Cole. Dep. [D.E. 68-26] 33; Martin Dep. [D.E. 68-14] 4–5.

After Martin's meeting with Cole on December 14, 2014, Martin asked Swann to examine the NCEES data for WCMS during the 2013–14 school year. See Martin Dep. [D.E. 68-14] 6–7. Swann examined the data and compiled her results in a spreadsheet. See Martin Dep. Ex. 14 [D.E. 84-8] 4–13; Swann Aff. [D.E. 68-2] ¶ 6. Martin then asked Swann to interview ten teachers at WCMS. See Martin Dep. Ex. 3 [D.E. 68-16] 2; Swann Aff. [D.E. 68-2] ¶ 12. In January 2015, Swann conducted teacher interviews as requested and her "interviews confirmed that there were

3

serious concerns with the teacher evaluation process at [WCMS]." Swann Aff. [D.E. 68-2] ¶¶ 12–15. On February 11, 2015, Cole, Martin, and Locklair met to discuss the teacher interviews. See Am. Compl. ¶ 26; Locklair Aff. [D.E. 68-4] ¶ 10. During the meeting, Cole "did not dispute the accuracy of any of the information shared with her," but stated that she "would get the necessary observations completed." Locklair Aff. [D.E. 68-4] ¶¶ 10–11. On February 19, 2015, Martin and Swann sent Thilman and Locklair a letter detailing "WCMS Evaluation Concerns." Martin Dep. Ex. 3 [D.E. 68-16]. The letter summarized Swann's and Martin's findings to date, discussed Martin's interviews with teachers, and noted Locklair's and Martin's discussion with Cole during the February 11 meeting. See id. at 1–7. Additionally, Swann and Martin concluded that "a substantial pattern of noncompliance with, and neglect of, the state and local mandated evaluation process" existed at WCMS for 2013-14. Id. at 6.

On February 27, 2015, Thilman and Locklair met with Cole to discuss the findings in Martin's and Swann's February 19 letter. See Locklair Aff. [D.E. 68-4] ¶ 13. At that meeting, Locklair testified that Cole "did not substantively respond to the concerns" in Swann's and Martin's February 19 letter. Id.

On April 6, 2015, Locklair sent Cole a letter recounting the February 27, 2015 meeting with Locklair and Thilman, reiterating the findings of Martin's and Swann's investigation, and expressing the need for Cole's improvement with teacher evaluations. See Locklair Aff. Ex. 6 [D.E. 68-10] 1–8. On April 9, 2015, Locklair conducted a mid-year review with Cole and rated Cole as "not progressing" on her personal goal of Human Resources Leadership relating to teacher evaluations. Locklair Aff. [D.E. 68-4] ¶ 17. Following the review, Locklair, Martin, Thilman, and Moore began to discuss transferring Cole to another position within WCPSS. See id. at ¶ 9.

On May 28, 2015, Locklair conducted a year-end review with Cole and rated Cole as

4

"Developing" in "Standard IV-Human Resource Leadership." Id. at ¶ 22. Locklair stated that the rating related to Cole's "failure to appropriately implement the teacher evaluation process, and the limited progress in that area." Id. Following the review, the Board reassigned Cole to a position in the WCPSS Central Office as the Director of Intervention Services ("DIS"). See id. at ¶ 23. On June 23, 2015, Thilman sent Cole a formal notice of reassignment to the DIS position. See Cole Dep. Ex. 10 [D.E. 84-15] 1. In the letter, Thilman stated that, as DIS, Cole would "provide critical leadership to the school system's ... coaches and coordinating teachers," and that the position is "aligned with the significant role of providing behavior support to our schools." Id. Thilman also noted that July 1, 2015, would be the effective date for Cole's role as DIS. See id.

On July 14, 2015, Cole filed a "Charge of Discrimination" with the Equal Employment Opportunity Commission ("EEOC") concerning the reassignment. See Am. Compl. ¶¶ 83–84. On July 29, 2015, Cole began the WCPSS grievance process, and the Board held the "level one" grievance hearing. See Locklair. Aff. Ex. 8 [D.E. 68-12] 1. On August 10, 2015, Thilman sent Cole a written response to her grievance explaining that the DIS position provided leadership opportunities, that Cole would maintain her salary and benefits, and that the Board did not view the transfer as a demotion. See id. at 1–2. In that letter, Thilman reiterated the role of DIS as one in which Cole would be "responsible for providing leadership over critical district[-]wide programs such as PBIS, budget responsibility, as well as developing district policies, regulations, and procedures and supervising and evaluating program staff." Id. The decision to transfer Cole was upheld during the WCPSS grievance process. See Merrill Dep. [D.E. 68-22].

Cole never reported to work as the DIS. See Cole Dep. Ex. 11 [D.E. 68-28] 1. From the start date for her role as DIS until October 20, 2016, Cole used accrued sick leave. See id. On March 7, 2017, Martin sent Cole a letter notifying Cole of the Board's policy on absences and that her

5

"continued absences [beyond October 20, 2016,] have placed [her] job in jeopardy." Id. On April 26, 2017, Merrill sent Cole a letter stating that Merrill would not recommend to the Board that the Board renew Cole's contract in light of Cole's failure to report to work. See Merrill Dep. Ex. 2 [D.E. 68-23] 1–5. Cole appealed Merrill's recommendation, and on May 31, 2017, the Board voted to uphold Merrill's recommendation. See Am. Compl. ¶ 98.

II.

Title VII prohibits an employer from discharging an employee "because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a Title VII violation in two ways. First, a plaintiff can show through direct evidence that racial discrimination motivated an employer's adverse employment action. See, e.g., Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). If a plaintiff lacks direct evidence (as in this case), a plaintiff can alternatively proceed under the burden-shifting framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973). See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), abrogated in part on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338 (2013). The McDonnell Douglas framework applies to both discrimination and retaliation claims under Title VII. See, e.g., Beall v. Abbott Labs, 130 F.3d 614, 619 (4th Cir. 1997), abrogated in part on other grounds by Gilliam v. S.C. Dep't of Juvenile Justice, 474 F.3d 134 (4th Cir. 2007).

Under McDonnell Douglas, a plaintiff establishes a prima facie case of race discrimination by showing that (1) she is a member of a protected class, (2) she was discharged, (3) she was fulfilling her employer's legitimate expectations at the time of her discharge, and (4) the discharge occurred under circumstances permitting a reasonable inference of race discrimination. See, e.g., Hill, 354 F.3d at 285; Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995); Tahir v. Sessions, No.

6

5:16-CV-781-D, 2017 WL 1735158, at *4 (E.D.N.C. May 2, 2017) (unpublished), aff'd, 703 F. App'x 211 (4th Cir. 2017) (per curiam) (unpublished); Howard v. Coll. of the Albemarle, 262 F. Supp. 3d 322, 331 (E.D.N.C. 2017), aff'd, 697 F. App'x 257 (4th Cir. 2017) (per curiam) (unpublished).

If the plaintiff establishes a prima facie case, the burden shifts to the defendant to produce evidence that the adverse employment action was "for a legitimate, nondiscriminatory reason." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981). This burden is one of production, not persuasion. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509–11 (1993). If the defendant offers admissible evidence sufficient to meet its burden of production, "the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's stated reasons were not its true reasons, but were a pretext for discrimination." Hill, 354 F.3d at 285 (quotation omitted); see, e.g., Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); King v. Rumsfeld, 328 F.3d 145, 150–54 (4th Cir. 2003). A plaintiff can do so by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [race] discrimination." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted); see Reeves, 530 U.S. at 147.

In seeking summary judgment, the Board argues that Cole's transfer to the DIS position was not an adverse employment action, and that Cole was not meeting the Board's legitimate employment expectations at the time of the transfer or the non-renewal. See [D.E. 69] 16–23. The Board also argues that Cole cannot show that the Board's decision not to renew Cole's role as DIS was retaliatory. See id. at 24–25. Lastly, the Board contends that the Board's explanations for its decisions to transfer Cole's employment to the DIS position or not renew Cole's contract were not pretexts for illegal discrimination. See id. 25–27.

7

A.

An adverse employment action must "adversely affect[] the terms, conditions, or benefits of the plaintiff's employment." Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (4th Cir. 2007) (quotation omitted); see Adams v. Anne Arundel Cty. Pub. Schs., 789 F.3d 422, 429–30 (4th Cir. 2015); James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375–76 (4th Cir. 2004); Pledger v. UHS-Pruitt Corp., No. 5:12-CV-484-F, 2013 WL 1751373, at *6 n.10 (E.D.N.C. Apr. 23, 2013) (unpublished); Gray v. Walmart Stores, Inc., No. 7:10-CV-171-BR, 2011 WL 4368415, at *2 (E.D.N.C. Sept. 19, 2011) (unpublished). Typical examples of adverse employment actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, [and] reduced opportunities for promotion." Boone v. Goldin, 178 F.3d 253, 255–56 (4th Cir. 1999); see Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc). Reassignment—and a corresponding change in working conditions—can constitute an adverse employment action, but only if it has a "significant detrimental effect" on the plaintiff. Boone, 178 F.3d at 256; see Adams, 789 F.3d at 429–30; Williams v. Brunswick Cty. Bd. of Educ., 725 F. Supp. 2d 538, 547 (E.D.N.C. 2010), aff'd, 440 F. App'x 169 (4th Cir. 2011) (per curiam) (unpublished). A lateral transfer with no effect on pay, benefits, or seniority, however, is not an adverse employment action. James, 368 F.3d at 375–76; Boone, 178 F.3d at 256–57; Walls v. Pitt Cty. Bd. of Educ., No. 4:13-CV-104-D, 2015 WL 4994259, at *5–6 (E.D.N.C. Aug. 19, 2015) (unpublished); Williams, 725 F. Supp. 2d at 549; Stout v. Kimberly Clark Corp., 201 F. Supp. 2d 593, 602 (M.D.N.C. 2002); see also Schurlock-Ferguson v. City of Durham, 381 F. App'x 302, 302 (4th Cir. 2010) (per curiam) (unpublished); Csicsmann v. Sallada, 211 F. App'x 163, 168 (4th Cir. 2006) (per curiam) (unpublished). When analyzing a transfer or reassignment, the "mere fact that a new job assignment is less appealing to the employee ... does not constitute adverse employment action." James, 368 F.3d at 376; see Boone, 178 F.3d

8

at 256–57. Moreover, an employee's perception of the new position as a demotion is close to irrelevant. See James, 368 F.3d at 375; Boone, 178 F.3d at 256–57; Williams, 725 F. Supp. 2d at 547.

Even viewing the evidence in the light most favorable to Cole, Cole fails to create a genuine issue of material fact concerning whether the Board's transfer decision was an "adverse employment action." It was not. See James, 368 F.3d at 375; Boone, 178 F.3d at 256–57; Walls, 2015 WL 4994259, at *5–6; Williams, 725 F. Supp. 2d at 547.

In opposition, Cole primarily argues that she understood the DIS position as a demotion from her position as WCMS principal. See [D.E. 79] 18–21. Her perception, however, does not create adverse employment action. See James, 368 F.3d at 375; Boone, 178 F.3d at 256–57; Williams, 725 F. Supp. 2d at 547. Next, Cole argues that Thilman's description of the DIS position in his August 10, 2015 letter is "direct evidence of loss of job title and supervisory responsibility." [D.E. 79] 18. The court has reviewed the letter and disagrees. See id.; cf. James, 368 F.3d at 376; Boone, 178 F.3d at 256–57; Walls, 2015 WL 4994259, at *5–6; Williams, 725 F. Supp. 2d at 547.

Additionally, Cole argues that the DIS position hurt her chances for promotion. See [D.E. 79] 18–19. Cole's argument, however, asks the court to assume her career trajectory for a job in which she failed to report to work, and to speculate that if she had reported to work as DIS, then she would not have received a promotion. Cole's speculation about her future prospects for promotion do not suffice. See, e.g., James, 368 F.3d at 377. Even viewing the evidence in a light most favorable to Cole, she has failed to raise any genuine issue of material fact concerning whether reassigning her to the DIS position was an adverse employment action. It was not.

B.

Alternatively, Cole has failed to create a genuine issue of material fact concerning whether

9

she was meeting the Board's legitimate expectations of employment at the time of the transfer or the contract non-renewal. When a court analyzes whether an employee was meeting her employer's legitimate expectations, "it is the perception of the [employer] which is relevant, not the self-assessment of the plaintiff." Hawkins v. PepsiCo, Inc, 203 F.3d 274, 280 (4th Cir. 2000) (alteration and quotation omitted); see Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 518 (4th Cir. 2006); King, 328 F.3d at 149; Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980); McDougal-Wilson v. Goodyear Tire & Rubber Co., 427 F. Supp. 2d 595, 607 (E.D.N.C. 2006). Thus, an employee's own testimony about her job performance does not create a genuine issue of material fact as to whether she was meeting her employer's legitimate expectations. See, e.g., King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Smith, 618 F.2d at 1067; Smith v. Martin, No. 5:10-CV-248-D, 2011 WL 3703255, at *5 (E.D.N.C. Aug. 23, 2011) (unpublished); O'Daniel v. United Hospice, No. 4:09-CV-72-D, 2010 WL 3835024, at *4 (E.D.N.C. Sept. 29, 2010) (unpublished); Lloyd v. New Hanover Reg'l Med. Ctr., No. 7:06-CV-130-D, 2009 WL 890470, at *9 (E.D.N.C. Mar. 31, 2009) (unpublished); McDougal-Wilson, 427 F. Supp. 2d at 611. Moreover, the employee must show that she was meeting the employer's legitimate expectations at the time of the adverse employment action. See, Warch, 435 F.3d at 517; Addison v. CMH Homes, Inc., 47 F. Supp. 3d 404, 420 (D.S.C. 2014); Jones v. Dole Food Co., Inc., 827 F. Supp. 2d 532, 547 (W.D.N.C. 2011), aff'd, 473 F. App'x 270 (4th Cir. 2012) (unpublished). Alternatively, the employee may show that the employer's expectations were somehow "not legitimate" or that the expectations "were a sham designed to hide the employer's discriminatory purpose." Warch, 435 F.3d at 518 (quotation omitted); see Addison, 47 F. Supp. 3d at 420.

Cole argues that her positive performance reviews before the transfer decision demonstrate that she was meeting the Board's legitimate expectations of employment at the time of her transfer

to the DIS position. See [D.E. 79] 15–16. Cole, however, has failed to provide evidence of a performance review, or any other evaluation, from the Board at the time of the Board's transfer decision to support her claim. Furthermore, Cole's testimony, by itself, does not suffice to meet her burden. See, e.g., King, 328 F.3d at 149.

Additionally, Cole argues that she "was actually leading the entire district" in teacher evaluations. [D.E. 79] 7, 17. That claim is false. Although WCMS, as a school, completed an above-average number of teacher evaluations in the 2014-15 school year, Cole did not personally complete any of the evaluations. See Martin Dep. Ex. 3 [D.E. 68-16] 6.

Next, Cole argues that the WCPSS teacher evaluation time line was for guidance purposes and that Cole did not have to follow it. Moreover, Cole asserts that she was not required, as principal, to personally complete a certain number of evaluations. See [D.E. 79] 17; N.C. Gen. Stat. § 115C-333.1; [D.E. 68-6, 68-7, 68-8].

That the Board expected Cole to complete some teacher evaluations comports with the statute, the Policy Manual, and Board policy and does not delegitimize the Board's expectation that Cole participate in the evaluation process. In fact, the Board's policy "requires" the principal— evidenced by use of the word "shall"—to complete certain tasks during the evaluation process. See [D.E. 68-6] 3. Accordingly, the Board's expectations were not a "sham."

Cole also argues that she met the Board's expectations for completing teacher evaluations, but blames the NCEES technical issues during the 2013–14 school year for the lack of data on her evaluations. See [D.E. 79] 17. Cole, however, does not provide evidence that she completed her teacher evaluations in the 2013–14 school year. Furthermore, Cole does not connect the technical issues to her failure to complete teacher evaluations in the 2014-15 school year. Cf. Reynolds Dep. Ex. 3 [84-18] 1–26. Cole's argument also fails to address any of the issues that the Board identified

11

in WCMS's evaluation process. Again, Cole's testimony does not create a genuine issue of material fact. See, e.g., King, 328 F.3d at 149. Accordingly, even viewing the record in the light most favorable to Cole, she has failed to create a genuine issue of material fact regarding whether she was meeting the Board's legitimate expectations of employment at the time of the transfer or the contract non-renewal. She was not.

C.

As for Cole's retaliation claim, Cole must prove that (1) she engaged in a protected activity under Title VII, (2) her employer took action against her that a reasonable employee would find materially adverse, and (3) her employer took the adverse action because of the protected activity. See DeMasters v. Carilion Clinic, 796 F.3d 409, 416 (4th Cir. 2015); Boyer-Libero v. Fontainbleau Corp., 786 F.3d 264, 281 (4th Cir. 2015) (en banc); Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 410 (4th Cir. 2013); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67–70 (2006). "Retaliation claims . . . require the employee to show that retaliation was a but-for cause of a challenged adverse employment action." Guessous v. Fairview Prop. Inv., LLC, 828 F.3d 208, 217 (4th Cir. 2016) (quotation and citation omitted); see Huckelba v. Deering, No. 5:16-CV-247-D, 2016 WL 6082032, *3 (E.D.N.C. Oct. 17, 2016) (unpublished). "Naked allegations of a causal connection between plaintiff's protected activity and the alleged retaliation do not state a plausible Title VII claim." Huckelba, 2016 WL 6082032 at *3. Furthermore, the employee must demonstrate temporal proximity between the alleged retaliation and the protected activity. See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273, 274 (2001) (per curiam); Hooven-Lewis v. Caldera, 249 F.3d 259, 278 (4th Cir. 2001); Brown v. Wake Cty. Gov., No. 5:16-CV-806, 2017 WL 2982971, at *4 (E.D.N.C. July 12, 2017) (unpublished); Huckelba, 2016 WL 6082032, at *4.

12

The amended complaint alleges that on July 14, 2015, Cole filed a discrimination action with the EEOC. See Am. Compl. ¶ 95. On June 16, 2016, Cole filed this lawsuit, and the Board removed the action to this court on August 25, 2016. See id. at ¶ 96. On April 26, 2017, the Board decided not to renew Cole's contract. See id. at ¶ 97. Cole asserts a retaliation claim concerning the contract non-renewal decision.

In seeking summary judgment on Cole's retaliation claim, the Board contends that its decision not to renew Cole's contract was not retaliatory. Rather, the Board states that it did not renew Cole's contract because Cole did not show up to work for the DIS position even after exhausting her sick leave. See [D.E. 69] 24–25.

When Cole filed an EEOC complaint, she engaged in protected activity. See, e.g., Brown, 2017 WL 2982971, at *5. Moreover, the Board's nonrenewal of Cole's contract is a materially adverse action. See id. However, the nearly two-year gap between when Cole filed the EEOC complaint and the Board's nonrenewal decision "negates any inference that a causal connection exists between the two." Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998); see Breeden, 552 U.S. at 274. Furthermore, Cole's speculation about retaliation does not create a genuine issue of material fact. See, e.g., Huckelba, 2016 WL 6082032 at *3. Accordingly, Cole's retaliation claim fails.

D.

Alternatively, no genuine issue of material fact exists as to pretext. A plaintiff can demonstrate pretext by showing that the employer's nondiscriminatory "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." In analyzing pretext, the court does not sit to decide whether the defendant, in fact, illegally discriminated against the plaintiff. See, e.g., Holland, 487 F.3d at 217; Hawkins, 203 F.3d

13

at 279–80. Rather, the court focuses on whether the plaintiff has raised a genuine issue of material fact as to pretext within the meaning of Reeves and its Fourth Circuit progeny. A plaintiff's mere speculation about pretext is not enough. See, e.g., Holland, 487 F.3d at 216–18; Mereish, 359 F.3d at 336–39; Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 444 (4th Cir. 1998), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002). Furthermore, a plaintiff's perception of her own experience, performance, and skills is not relevant. It is the perception of the decisionmaker that counts. See, e.g., King, 328 F.3d at 149; Hawkins, 203 F.3d at 280; Flax, 618 F.2d at 1067; McDougal-Wilson, 427 F. Supp. 2d at 607.

As for pretext, the Board states that it transferred Cole because of her performance of evaluations at WCMS. The Board also states that it did not renew Cole's contract because she did not report to work at her central office job for over six months following the end of her sick leave absences. See [D.E. 69] 25–27.

In opposition, Cole presents arguments very heavy on intrigue, but very light on evidence. Essentially, Cole's argument centers on Swann's spreadsheet detailing the Board's investigation concerning Cole. See [D.E. 79] 26–29. Specifically, Cole alleges that Swann incorrectly stated one individual was an administrator when she was only a teacher, incorrectly stated the year of one evaluation, incorrectly reported the number of times one teacher was observed, and incorrectly reported that two individuals taught at WCMS when they in fact did not. See id. at 26–27. Cole then asks the court to assume the Board acted with discriminatory intent in ordering Swann to complete the evaluation, that Swann in fact participated in the Board's discriminatory scheme, and that these inaccuracies are proof of both.

Even assuming that Cole is correct about inaccuracies in Swann's spreadsheet, the inaccuracies do not equate to a pretext for illegal discrimination. See, e.g., Mereish, 359 F.3d at 336;

14

McDougal-Wilson, 427 F. Supp. 2d at 603–04. Even viewing the evidence in the light most favorable to Cole, no reasonable jury could find that Swann's spreadsheet was a pretext for illegal discrimination.

Finally, Cole argues that the NCEES system data is unreliable as a basis for her transfer because certain WCPSS administrators could access and change the NCEES entries and because the system had technical errors. See [D.E. 79] at 27–28. This claim appears related to Cole's argument that Board administrators manufactured the stated issues with Cole's handling of the teacher evaluation process as WCMS. See id. at 16–17. Cole fails to show, however, how either circumstance demonstrates pretext. Moreover, to the extent Cole relies on allegations that the Board attempted to demote her before deciding to transfer her, the only support Cole provides is her affidavit. See [D.E. 80] ¶ 88. Cole's speculation does not suffice. See, e.g., Holland, 487 F.3d at 216–18; Mereish, 359 F.3d at 336–39. Accordingly, Cole has failed to create a genuine issue of material fact regarding whether the Board's stated reasons for Cole's transfer to the DIS position or the nonrenewal of Cole's contract were pretexts for illegal discrimination. They were not.

### III.

In sum, the court GRANTS the defendant's motion for summary judgment [D.E. 66]. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 28 day of February 2020.

JAMES C. DEVER III
United States District Judge